IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| ERMIS VELIZ | § | |
| and INTERSTATE CARRIER, LLC | § | |
| *Plaintiffs* | § | |
| V. | § | CASE NO.: 5:22-CV-00267 |
| | § | |
| GOAL RECYCLING SERVICES, LLC, | § | |
| CARLOS A. GORDOA and ARIANI REYES | § | |
| *Defendants* | § | |

# PLAINTIFFS' ORIGINAL COMPLAINT

## I.    PARTIES

1.    Plaintiff, Interstate Carrier, LLC is a Limited Liability Company that is incorporated under the laws of the State of California and may be reached through the undersigned counsel.

2.    Plaintiff, Ermis Veliz, is an individual and a citizen of the State of California, who may be reached through the undersigned counsel.

3.    Defendant GOAL Recycling Services, LLC is a Limited Liability Company that is incorporated under the laws of the State of Texas which may be served through its registered agent, Sergio Eduardo Gordoa, at 15310 IH 34 S., No. 4, Von Ormy, Texas 78073, or wherever he may be found.

4.    Defendant Carlos A. Gordoa is an individual and citizen of the State of Texas who may be served at his last known place of abode, 24334 Vinca Reef, San Antonio, Texas 78260, or wherever he may be found.

5.    Defendant Ariani Reyes is an individual and citizen of the State of Texas who may be served at her last known place of abode, 24334 Vinca Reef, San Antonio, Texas 78260, or wherever she may be found.

## II.      JURISDICTION

6.      The Court has jurisdiction over the lawsuit under 28 U.S.C. §1332(a)(1) because Plaintiffs and Defendants are citizens of different U.S. states, and the amount in controversy exceeds $75,000, excluding interest and costs.

## III.      VENUE

7.      Venue is proper under 28 U.S.C. §1391(b)(1) because Defendants reside in this district and all Defendants reside in this State.

## IV.      CONDITIONS PRECEDENT

8.      All conditions precedent have been performed or have occurred.

## V.      FACTS

9.      Plaintiffs Ermis Veliz and Interstate Carrier, LLC will be collectively referred to as "***Plaintiffs***", or individually as "***Plaintiff Veliz***" and "***Plaintiff Interstate***", respectively. Defendants GOAL Recycling Services, Carlos A. Gordoa, and Ariani Reyes will be collectively referred to as "***Defendants***" or individually as "***Defendant GOAL***", "***Defendant Gordoa***", or "***Defendant Reyes***".

10.      Defendant GOAL is the owner of the real property commonly known as 15310 Interstate 35 South, Unit 4, Von Ormy, Texas 78073 (the "***Yard***"). Defendant Gordoa is a manager of Defendant GOAL. Defendant Reyes is an employee of Defendant GOAL and the wife of Defendant Gordoa. At all times, the representations made by Defendant GOAL, an entity, were made by Defendant Gordoa and Defendant Reyes.

11.      In the summer of 2020, Plaintiffs began searching for real property to rent in the San Antonio area in furtherance of their business. Plaintiffs met with Defendant Reyes, who represented herself to be a licensed real estate agent, to show the real property at 15310 Intestate 35, Von Ormy, Texas.

12.     After discussing and negotiating the terms of the proposed rental, on or about July 1, 2020, Defendant GOAL and Plaintiffs entered into a commercial lease agreement (the "***Lease***") wherein the Plaintiffs were to lease and the Defendant was to make available for lease approximately 10,700 square feet of space referred to as the "***Leased Premises***." The Leased Premises included 1,800 square feet of covered warehouse, 430 square feet of office/kitchen/bathroom, and 5 parking spaces designated for trucks or 18 wheelers. A true and correct copy of the Lease is attached hereto as ***Exhibit A*** and incorporated by reference.

13.     In consideration, Plaintiffs were to pay a base rent of $2,500 per month with various fixed rental adjustments. As of the date of the filing of this Petition, the base rent is $2,625.00 (although the Lease causes some confusion here, stating "$2,625.00 (two thousand six hundred 00/100 US Dollars)".

14.     A variety of other obligations relevant to this suit were placed on the Plaintiffs and Defendant by the Lease. These include:

a.      The Defendant GOAL covenanted and warranted that it would keep and maintain Plaintiffs' exclusive, quiet, peaceable, undisturbed, and uninterrupted possession of the Leased Premises during the term of the Lease. *See* **Exhibit A**, Paragraph 13.

b.      Plaintiffs were obligated to pay the taxes on the Leased Premises. *See* **Exhibit A**, Paragraph 8.

c.      Pursuant to the Lease, the rent payments were due by the 5th day of each month to the Landlord at 24334 Vinca Reef, San Antonio, Texas 78260 "or at such other place designated by written notice from Landlord [to] Tenant". This address is the home address of Defendants Gordoa and Reyes. Defendants immediately notified the Plaintiffs that rent should be paid via the online links provided in each monthly

invoice, and at all times, Plaintiffs made such payments online as requested by the Defendants.

d.      Relevant to this suit, the Leased Premises included "nonexclusive reasonable access across any other land owned by the Landlord as may be required for the use of the Leased Premises by Tenant, with such access to be on such roadways, sidewalks, and other common areas of which the premises are a part, or of any such adjacent lands owned by Landlord" *See* **Exhibit A**, Paragraph 1.

15.     In addition to the Leased Premises, the Yard contained an additional office building of about 400 square feet, and a 2,750 enclosed warehouse with three electric loading docks, suitable for the shipping and trucking industry.

16.     In early 2021 Plaintiffs sought to lease additional space in the Yard from the Defendants, which included the warehouse with loading docks, and office building (hereinafter the "***Additional Space***"). The Defendants had represented to the Plaintiff that the Additional Space, which had recently been constructed, was ready to lease.

17.     As a result of the representation, on or about May 1, 2021, Plaintiffs met with Defendant Gordoa at the Yard to execute an amendment or addendum to the Lease to include the Additional Space. Instead of signing an addendum or amendment, however, Defendant Gordoa presented Plaintiff with a second Commercial Lease Agreement (the "***Second Lease***"), which was substantially like the Lease.  A true and correct copy of the Second Lease is attached hereto as ***Exhibit B*** and is incorporated by reference. In the Second Lease, Landlord was to make available 2,750 square feet of Warehouse with three loading docks and a 414 square foot Office.

18.     The base rent for the Second Lease was $3,200 per month. Payment terms were identical to the Lease. The remaining terms of the Second Lease were also identical to the Lease.

19.     Immediately after executing the Second Lease, Plaintiff and Defendant Gordoa walked to the Warehouse building with the loading docks and noticed that the work was incomplete, there was no electricity, and a variety of other issues impaired Plaintiffs' ability to use the Additional Space.

20.     Seeing that the Office and Warehouse were not ready to be rented, Plaintiffs and Defendants agreed to cancel the Second Lease which they had just signed. Defendant Gordoa represented to Plaintiff that he would just tear it up and they could sign a new one once the space was ready.

21.     Unfortunately, Defendant Gordoa did not tear the agreement up as discussed, but rather uses it to continuously harass the Plaintiff in conjunction with the other harassing behavior discussed herein. Defendants' harassment includes repeated demands for payment of rent under the Second Lease.

22.     To minimize the harassment, and resolve the issues, Plaintiff hired a property inspector, Mr. Ruben Rosas Jr., to perform an inspection of the Additional Space on August 24, 2021. The Inspection revealed a myriad of issues, including damaged roofing, openings in sidings, foundation issues, plumbing issues, electrical issues (including safety hazards), issues with the roll up doors, window issues, moisture, and mold. A true and correct copy of the Inspection is attached as ***Exhibit C*** and is incorporated by reference.

23.     Shortly thereafter, the Bexar County Fire Marshall came to the premises and applied red stickers containing bold print stating "STOP WORK". The stickers further stated that "By Order of the Bexar County Fire Marshall, all construction related activities must stop immediately and this facility may not be used or occupied until all violations have been corrected and inspected by a Bexar County Deputy Fire Marshal and found to be in full compliance with all applicable state/local laws". These stickers were placed by the Fire

Marshall on each opening of the office space and of the warehouse. A true and correct photo of the stickers are attached as ***Exhibit D*** and are incorporated by reference.

24.    Nevertheless, despite the Additional Space being incomplete, outright dangerous, and a Stop Work Order being applied by the County, the Defendants continue to this day to harass Plaintiffs by attempting to obtain rent for the Additional Space. In fact, Defendants even went so far as to sue the Plaintiffs in the JP Court for over $14,000 in unpaid rent and alleged "lease violations". A true and correct copy of the Eviction Petition is attached as ***Exhibit E*** and is incorporated by reference. After Plaintiffs hired an attorney and incurred expenses, the Defendants dismissed the Eviction Petition.

25.    It was after the Plaintiffs could not rent the additional space from the Defendants that the Defendants began a slew of harassing activities against the Plaintiffs, each of which interfered and continues to interfere with Plaintiffs' quiet use of the Leased Space and Plaintiffs' business operations.

**Invoice Payment**

26.    When the lease between Plaintiffs and Defendant GOAL started, the Defendants informed the Plaintiff that the payments should be made electronically via the link on the invoices which were emailed to the Plaintiff Veliz. Beginning with the first month's rent, the Plaintiffs would receive an email powered by Quickbooks. Each email requested payment and afforded the Plaintiffs the ability to click a hyperlink to "review and pay" the invoice. Each month, Plaintiffs would click the "review and pay" hyperlink, review the invoice, and pay the invoice.

27.    This payment method remained the same until February 2022. When Plaintiffs received the February 2022 invoice, however, the options on the hyperlink had changed to "Print or Save".

28.    Plaintiff Veliz immediately reached out to Defendant Gordoa to obtain the hyperlink so he could make the payment timely. Unfortunately, Defendant Gordoa purposefully chose to

ignore Plaintiff Veliz's emails (even though email was the main form of communication between Plaintiffs and Defendants) until after the due date for payment. Immediately after the due date, Defendant Gordoa finally replied "Need to pay according to contract Please add a 15% late fee penalty because is later than the 5th of each month thanks."

29. Defendants changed the method and form of payment without notifying Plaintiffs of the change, even though the Lease requires the Defendant GOAL to give Plaintiffs written notice a new payment format. *See* **Exhibit A**, Paragraph 2.

**Harassment of Drivers / Interference with quiet enjoyment**

30. Beyond harassing the Plaintiffs directly, the Defendants continue to harass the Plaintiffs' employees and drivers. For example, as recently as March 6, 2022, Defendant Gordoa appeared at the Leased Premises at 9:51PM while one of Plaintiffs' drivers was attempting to enter the property, and videotaped Plaintiffs' driver opening the gate and entering the property:



31. This type of behavior by Defendant Gordoa has occurred continuously since Plaintiffs were unable to rent the additional space. Defendant Gordoa shows up in a variety of different vehicles and often would yell at and harass Plaintiffs' employees, entirely without provocation.

In fact, some of Plaintiffs' employees have expressed a fear of Defendant Gordoa's unannounced visits and actions.

32.    Defendant Gordoa and/or his staff or agents would appear at the Leased space and intentionally interfere with Plaintiffs' business operations. For example, on March 1, 2022 Defendant Gordoa appeared and blocked the exit gate with a white vehicle so that one of Plaintiffs' drivers could not leave:



33.    On the same day, the Defendant Gordoa stopped his white pickup at the Plaintiffs' mailbox in front of the Leased Premises and took Plaintiffs' mail out of the mailbox. To this day, at the very least, a letter and license plate from the Texas Department of Motor Vehicles is missing. Upon information and belief, the Defendant Gordoa retrieved it from the mailbox:



34.    The theft of Plaintiffs' mail has been an ongoing issue, caused directly by the Defendants.

**Property Taxes**

35. According to the Lease, Plaintiffs are required to reimburse the Defendant GOAL for all "general real estate taxes and installments of special assessments coming due during the Lease term on the Leased Premises. *See* **Exhibit A** Paragraph 8.

36. The Defendants sent Plaintiffs an invoice (no. 1094) for the Ad Valorem Taxes in the amount of $5,498.57, dated March 1, 2022. A true and correct copy of the invoice is attached as ***Exhibit F*** and is incorporated by reference.

37. Unfortunately, this number appears to be fabricated by the Defendants and is not based on actual taxable values. The Yard has three property identification numbers assigned to it by the Bexar County Appraisal District. These are:

    a.    1210440 -  2021 Taxes: $4,441.48

    b.    1261550 – 2021 Taxes: $82.51 (personal property)

    c.    1273143 – 2021 Taxes: $1,688.54

38. The Yard is comprised of a total of approximately 282,391 square feet, or almost 6.5 acres. Plaintiffs lease a small portion of that, which includes less than half of the enclosed structures on the property. As a result, attempting to force the Plaintiffs to pay over 88% of the property's taxes is yet another form of harassment, and a clear breach of the Lease.

**Parking Violations**

39. According to the Lease, Plaintiffs were supposed to receive 10,700 square feet of leased space, of which 2,230 square feet were enclosed spaces, and the remaining 8,470 square feet were parking areas and concrete parking. The 8,470 square feet included about 3,850 square feet of Tractor Trailer parking on the other side of the common area driveways.

40. It is important to note that none of the parking areas were marked or specifically designated. Instead, the parties, prior to entering the Lease, walked the Yard and discussed where Plaintiffs

could and would park, and what concrete area Plaintiffs would have exclusive access to, and what concrete areas were common areas.

41.   Immediately after entering the lease, on or about May 15, 2020, Plaintiffs and Defendants discussed an additional 5 parking spots on the other side of the common area, thereby allowing Plaintiffs up to 10 spots. In the text-exchange, the parties agreed that as consideration for the additional spots, rent would automatically increase to $2,600 per month. Plaintiffs paid that amount and Defendants accepted that amount, even though the Lease only contemplated a base rent of $2,500.

42.   In addition, Defendants, through Defendant Reyes, confirmed that Plaintiffs could sublease the additional parking spots to Tractor Trailers if the Plaintiff so wished. In fact, Defendant Reyes conferred with Plaintiffs about the subleasing of parking spots to additional individuals – namely one Daniel Travis in particular.

43.   After 2021, Defendants began harassing Plaintiffs about their use of the parking spots and repeatedly threatened to tow Plaintiffs' vehicles. On more than one occasion, Plaintiffs had to fend off tow trucks coming to pick up vehicles without notice to Plaintiffs, and for no reason other than to harass the Plaintiffs and impair the Plaintiffs' business.

44.   Defendants then informed Plaintiffs that Defendant Reyes no longer worked for Defendants and that Plaintiffs were not permitted to sublease any parking spots. Therefore, Plaintiffs stopped any attempts at subleasing parking spots.

**Painting of Parking Lines**

45.   Throughout the Yard, there are no markings indicating parking spots, exit and entry lanes, or any other form of identification of common areas or leased areas, other than the existence of structures such as the Warehouse.

46.     In early March 2022, Defendants wanted to paint parking spot markings on the pavement so as to restrict the Plaintiffs to a specific area. Counsel for Defendants and counsel for Plaintiffs agreed that Defendants would enter the premises on March 8, 2022, to paint the parking spots.

47.     Unfortunately, when Defendants arrived, the harassing and belligerent behavior continued, resulting in Plaintiffs' need to call the local sheriff's office for assistance.

48.     Instead of using reasonable care and diligence to paint the parking spots, Defendants spray-painted markings on the pavement, and continued those markings onto the tires of Plaintiffs' employee's vehicle:



49.     Defendants' reckless disregard of Plaintiffs' and their employee's property shows the extent of the callousness of Defendants' behavior.

**Signage**

50.     As part of Plaintiffs' lease, Plaintiffs were required to obtain permission from the Defendant GOAL to place any signage on the Leased Premises.

51.     On or about September 3, 2020, Plaintiffs spoke with Defendant Reyes about the placement of a sign. Defendant Reyes provided Plaintiffs with not only permission to place the sign, but she also stated that Plaintiffs should contact a sign company she had worked with in the past

to obtain the banner-signs. Defendant Reyes sent Plaintiffs a link to the sign company. *See* **Exhibit G**, texts from Defendant Reyes.

52. Relying on Defendant Reyes' representation, which was made on behalf of the remaining Defendants, Plaintiffs contacted the sign company and obtained a sign. Plaintiffs then placed the sign on the front of the Leased Premises.

53. Until the summer of 2021, the sign was not a problem for Defendants – because express permission had been given. Unfortunately, after the Second Lease issues began, Defendants also started threatening to remove the sign and demanding that Plaintiffs remove the sign, and further claimed that Plaintiffs had no authority to place the sign.

54. These threats were yet another instance of the continued harassment experienced by the Plaintiffs.

**Gate Damage / Theft**

55. As part of the Lease, Plaintiffs agreed to take charge of the electric gates on the Leased Premises. After moving in, Plaintiffs hired a security company to repair the electric gates, install necessary components, and create functioning gates – a company recommended by Defendant Reyes.

56. In March 2022 Defendants wished to program a gate code for Defendants to use to access the Yard. Given the already strained relationship between the parties, counsel for Defendants and Counsel for Plaintiffs agreed that Defendants would enter the premises on March 8, 2022 to program the gate.

57. Unfortunately, rather than programming a gate code, Defendants instead took apart the gate opener completely and removed the new computer control board that Plaintiffs had paid to have installed.

58.     Defendants left both the entrance and exit gates inoperable and disconnected. Both gates were working perfectly prior to the Defendants' entry and work. As of the date of the filing of this suit, both gates remain inoperable due to Defendants' actions.

**Locking the Gates**

59.     After having damaged the electric gate openers to the extent that the gates no longer open, the Defendants attempted to remedy the security issue they caused by locking the gates with chains and locks.

60.     However, instead of locking the gates in a manner in which a reasonable person would have, the Defendants placed large, heavy-duty chains with large heavy-duty locks:

 

61.     To make matters worse, Defendants placed these chains and locks on the gates and outright refused to give the Plaintiffs the combination to the locks, effectively locking the Plaintiffs into the Leased Premises. Although pedestrian traffic could still exit through the front door, Plaintiffs and their employees were, for all practical purposes, held hostage and falsely imprisoned at the Leased Premises because they could not get their vehicles (or trucks) out.

**Impeding access**

62.    On or about the same time, Defendants also impeded Plaintiffs' employee's ability to enter and leave the Leased Premises. On various occasions, Tractor Trailers have been able to depart the Leased Premises to make deliveries or pick up loads. More specifically, on March 8, 2022, Defendants blocked two trucks from leaving the Premises. Each truck was heading to a pickup and was scheduled to drive interstate to make deliveries.

63.    By blocking their departure or movement, Defendants effectively impaired Plaintiffs' ability to conduct its business, thereby causing lost revenue.

64.    After seeing no other alternative to exit the Leased Premises, Plaintiffs had no choice but to cut the chains to allow its vehicles and employees to leave. Plaintiff placed new locks on the chains to protect the valuable equipment inside.

65.    The next day, Defendants appeared and again began yelling at the Plaintiffs and berating their employees about the access and the chains.

66.    After being informed by the Bexar County Sheriff's Department that the behavior should not occur, Defendants then went to the Justice of the Peace for Precinct 1 of Bexar County, Texas and filed a request for an ex parte writ of reentry. Defendants were informed by the Clerk of the Court that this was an improper filing and remedy but Defendants nevertheless forced the filing, attempting to obtain ex parte relief. Interestingly, this was not the first, or last time that Defendants sought unfounded assistance from the Justice Court.

67.    The Clerk notified Plaintiffs by phone at 5:30PM on March 9, 2022, of a hearing setting on March 10, 2022, at 9:00AM. Attached as ***Exhibit H*** is a copy of the notice of hearing that was forwarded to the undersigned.

68.    The undersigned appeared at the hearing on March 10, 2022, and obtained a dismissal of the action based on the fact that the remedy was not available to the landlord. At the hearing, the

Court informed the Defendants that Defendant Gordoa should consider, first of all, discussing the case with his attorney, but also that there may be a more appropriate Justice Court filing. Defendant Gordoa made no mention of having filed another case at the time.

69.     At the time, however, Defendant Gordoa had, in fact, already filed another eviction petition on March 9, 2022. A true and correct copy of the second eviction petition is attached as ***Exhibit I*** and is incorporated by reference. At the time of the filing of this suit, this Justice Court case remains pending.

70.     Both of these filings were yet another attempt at harassing the Plaintiffs and impeding their quiet use and enjoyment of the Leased Premises for which they pay valuable rent.

## VI.     COUNT 1 – BREACH OF CONTRACT

71.     Plaintiffs and Defendants entered into a valid and enforceable written contract which is incorporated herein by reference and identified above.

72.     Plaintiffs have fully performed their contractual obligations under the contract, or have been excused from performance of some of their obligations due to the Defendants' actions.

73.     Defendants breached the contract through the activities and behaviors identified herein.

74.     Defendants' breach has caused injury to the Plaintiffs.

75.     Plaintiffs seek unliquidated damages within the jurisdictional limits of this Court.

76.     Plaintiffs are entitled to recover reasonable and necessary attorney fees pursuant to the contract.

## VII.     COUNT 2 – INTENTIONAL NUISANCE

77.     Plaintiffs were the lessees of the Leased Premises described herein.

78.     Defendants created and maintained a set of harassing activities that substantially interfered with Plaintiffs' use and enjoyment of the Leased Premises, causing Plaintiffs and their

employees unreasonable discomfort, annoyance, and an inability for Plaintiffs to conduct business in a normal manner.

79.    Defendants intentionally created and maintained the conditions as described herein.

80.    Defendants caused damage to Plaintiffs' property, including the gate openers which Plaintiffs purchased, as well as damage to Plaintiffs' business in the form of lost profit due to lost opportunities resulting from Tractor Trailers' inability to leave.

81.    Plaintiffs seek damages within the jurisdictional limits of this Court.

82.    Plaintiffs' injury resulted from Defendants' gross negligence or malice, which entitles Plaintiffs to exemplary damages under TEXAS CIVIL PRACTICE & REMEDIES CODE section 41.003(a).

## VIII.    COUNT 3 – ABUSE OF PROCESS

83.    Plaintiffs were parties to three Justice Court Proceedings:

a.    Cause Number 12E2102123; Goal Recycling Services, LLC v. Interstate Carrier / Ermis Veliz, filed November 17, 2021

b.    Cause Number 12S2200101; Goal Recycling Services, LLC v. Interstate Carrier / Ermis Veliz, filed March 9, 2022.

c.    Cause Number 12E2200712, Goal Recycling Services, LLC v. Interstate Carrier / Ermis Veliz, filed March 9, 2022.

84.    In each preceding, Defendants had a citation issued. Although only two citations were served on Plaintiffs, Defendants sought citation in only two of the three cases. The citations were valid, regular, and properly issued.

85.    Defendants' perverted use of the citations and the pleadings were based on Defendants' ulterior motive of purposes and not the process's legitimate purpose. Rather, Defendants' intent behind the lawsuits was merely to harass the Plaintiffs.

86. Even the Justice Court Clerk, and again the Honorable Justice Court Judge informed the Defendants that the March pleading was improper, but Defendants nevertheless pursued the filing and attempted prosecution of the case.

87. Two of the cases have been dismissed. The November case was dismissed once counsel became involved, and the first March case was dismissed by the Court. The second March case remains pending.

88. As a result of the Defendants' improper use of legal proceedings, Plaintiffs suffered actual damages, including lost income and the expense of hiring counsel to defend.

89. Plaintiffs' injury resulted from Defendants' malice or actual fraud, which entitles Plaintiffs to exemplary damages under TEXAS CIVIL PRACTICE & REMEDIES CODE section 41.003(a)

## IX.   COUNT 4 – FALSE IMPRISONMENT

90. Defendants willfully detained Plaintiffs within the Leased Premises by chaining the entry and exit gates and preventing all forms of vehicular egress and ingress from the Leased Premises.

91. Plaintiffs did not consent to being detained within the Leased Premises.

92. Defendants did not have legal authority or justification to detain Plaintiffs within the Leased Premises.

93. As a result of Defendants' false imprisonment of Plaintiffs, Plaintiffs suffered actual damages including lost income and the expense of court costs and hiring counsel to defend.

94. As a result of Defendants' false imprisonment of Plaintiffs occurring with malice, Plaintiffs further are entitled to exemplary damages.

## X.   COUNT 5 – LIABILITY IN TORT FOR STALKING

95. Defendants engaged in harassing behavior by diligently and repeatedly directing conduct that is reasonably likely to harass, annoy, alarm, abuse, torment, and embarrass Plaintiffs as enumerated above.

96.     On more than once occasion, Defendants engaged in harassing behavior.

97.     As a result of Defendants' harassing behavior, Plaintiff Veliz and Plaintiff Interstate's employees reasonably feared for their safety and wellbeing.

98.     Plaintiffs demanded Defendants to stop engaging in harassing behavior on more than one occasion, however, Defendants continued to engage in harassing behavior.

## XI.    DAMAGES

99.     As a direct and proximate result of the Defendants' breach and actions, Plaintiffs suffered the following damages:

   a.    Actual damages incurred as a result of Defendants' harassment of Plaintiffs and hindrance of the contractual rights and obligations. Damages include costs associated with relocating an interstate trucking business, rebranding, transferring licenses, etc. Such costs are expected to exceed $85,000.

   b.    Reasonable expenses in reliance on Defendants' performance of the Contract. The expenses incurred thus far by the Plaintiffs exceed $1,000.

   c.    Loss of net profits. Plaintiffs are still calculating their lost net profits, but such lost profits exceed $12,000.

   d.    Costs and attorney fees.

## XII.    ATTORNEY'S FEES AND COSTS

98.     Request is made for all costs and reasonable and necessary attorney's fees incurred by or on behalf of Plaintiffs herein, including all fees necessary in the event of an appeal of this cause to the Court of Appeals and the Supreme Court of Texas, as the Court deems equitable and just, as provided by:  (a) Section 17.50(d) of the Texas Business and Commerce Code; (b) Chapter 38 of the Texas Civil Practice and Remedies Code; and, (c) common law.

## XIII.   PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiffs, Interstate Carrier, LLC and Ermis Veliz, respectfully pray that the Defendants be cited to appear and answer herein, and that upon a final hearing of the cause, judgment be entered for the Plaintiffs against Defendants, jointly and severally, for the economic and actual damages requested hereinabove in an amount in excess of the minimum jurisdictional limits of the Court, together with prejudgment and postjudgment interest at the maximum rate allowed by law, attorney's fees, costs of court, and such other and further relief to which the Plaintiff may be entitled at law or in equity, whether pled or unpled.

Respectfully submitted,

SHUMWAY VAN

GERRIT SCHULZE    (TBN: 24084877)
13750 San Pedro Avenue, Suite 810
San Antonio, Texas 78232
(210) 503-2800 phone
(210) 503-2888 facsimile
Gerrit@Shumwayvan.com

**ATTORNEYS FOR PLAINTIFFS**